**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:26-CV-174**

| | |
|---|---|
| USCONNECT, LLC,<br><br>   Plaintiff,<br><br> v.<br><br>VENDORS EXCHANGE<br>INTERNATIONAL, INC. and<br>VENDORS EXCHANGE<br>INTERNATIONAL, LLC d/b/a VE<br>SOLUTIONS,<br><br>   Defendants. | **COMPLAINT** |

COMES NOW Plaintiff USConnect, LLC ("USConnect"), by and through undersigned counsel, and complaining of Defendants Vendors Exchange International, Inc. ("VE") and Vendors Exchange International, LLC d/b/a VE Solutions ("VE Solutions") (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1. USConnect and Defendants are in the vending services industry, whereby consumers acquire food, beverage, and other products via cashless transactions from vending machines and self-serve micro-markets. To further their common business interests, USConnect and VE entered into a Master Services Agreement ("MSA") whereby VE agreed to manufacture and sell state-of-the-art kiosks (the "Integrated Products"). The Integrated Products were sold to those companies that provide vending services through USConnect's network of linked vending machines and self-serve micro-markets either vis-

à-vis a license agreement (known as "Affiliates") or through limited promotional programs (known as "Operators"). Once installed, the Integrated Products needed telemetry services to fully function and to enable, among other things, the cashless transactions to occur. The Affiliates and Operators were charged a monthly service fee (the "Service Fee") for these telemetry services.

2. Pursuant to the terms of the MSA, VE was obligated to notify USConnect of each Integrated Product it sold to any Affiliate/Operator. The MSA obligated VE to then submit an invoice to USConnect each month that identified each Integrated Product that used the telemetry services in the preceding month, broken out by Affiliate/Operator. Using VE's monthly invoices, USConnect would then collect the monthly Service Fee from the appropriate Affiliates/Operators. USConnect and VE would then share the monthly Service Fee that USConnect collected based upon a formula set forth in the MSA.

3. USConnect has recently discovered that apparently for years Defendants have been failing to properly notify USConnect of all Integrated Products that have been using the telemetry services, in breach of their obligations under the parties' agreements.

4. In some instances, Defendants' failure/breach appears to be from their negligent performance of their contractual duties. In such instances, Defendants' breach caused USConnect to not bill Affiliates/Operators for all of the Service Fees otherwise due and payable, thereby causing USConnect to miss out on its portion of the Service Fees (the "USC Share"). These breaches by Defendants have resulted in USConnect suffering six-figure damages.

5.     USConnect has also discovered that in other instances, however, Defendants have not been listing some of the Integrated Products on their invoices to USConnect not out of simple incompetence, but because Defendants sold Integrated Products directly to Affiliates/Operators without notifying USConnect of the sales (the "Undisclosed Kiosks") and then left the Undisclosed Kiosks off of the monthly invoices. USConnect has further uncovered that Defendants themselves then directly billed the Affiliates/Operators for the Service Fees associated with the Undisclosed Kiosks and kept all of the Affiliate/Operator's payments, thereby converting USConnect's portion of the Service Fees (i.e., the USC Share).

6.     Defendants' actions related to the improper invoicing (both from their incompetence and from their purposeful, conversion-related actions) have apparently been going on for years, and have continued even after the parties agreed in October 2024 to an extension through the end of 2026 on certain terms of the expiring-MSA (including the sharing of all service fees per the MSA's terms). (the "Continuation Agreement").

7.     Defendants' actions have deprived USConnect of a significant amount of money for a period of years and, upon information and belief, the statute of limitations may be about to expire on claims related to some of Defendants' bad acts.

## PARTIES, JURISDICTION, AND VENUE

8.     USConnect is a North Carolina limited liability company with its principal place of business in Guilford County, North Carolina.

9.     VE is an Ohio corporation with its principal place of business in Cleveland,

3

Ohio.  VE designs, manufactures, and sells merchandising systems for use in vending and retail applications, including, but not limited to, self-service kiosks.

10.     VE Solutions is an Ohio limited liability company with its principal place of business in Cleveland, Ohio.  VE Solutions has conducted significant business in the State of North Carolina and its officers have traveled to North Carolina on frequent occasions to conduct business on its behalf with USConnect and other businesses with locations inside the State of North Carolina.  Moreover, many of VE Solution's actions and communications that are described below and that are the subject of this complaint were directed toward the State of North Carolina and, in particular, to USConnect.  As such, the exercise of personal jurisdiction over VE Solutions satisfies all due process requirements.

11.     Upon information and belief, Defendants share many of the same employees and officers.  Although originally VE was the only operating entity of the two Defendants when the MSA was entered into, over the past several years the two companies have undergone a public "rebranding" campaign in a purposeful effort to make it appear as though they are the same entity.  Defendants have even gone so far as to assert in public and in public court filings that they consider themselves (for certain purposes, including those related to USConnect) to be the same entity.  In reality, they are not.  Defendants are two separate Ohio entities and, up until recently, both were in good standing with the Secretary of State of Ohio.  But recently, the corporate existence of VE was cancelled by the Ohio Secretary of State, and VE appears to no longer have the statutory authority to conduct business.  Upon information and belief, many of the business activities once

4

performed by VE have been implicitly assigned to and been taken over by VE Solutions (whether pursuant to a valid assignment or not). As a result of Defendants' actions whereby it cannot be determined at this time which entity was engage in the wrongful conduct, USConnect has asserted several claims in this matter in the alternative. To be clear, USConnect has never been approached by Defendants to provide its consent to any such assignment and has never provided any such consent.

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity between USConnect and the VE Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Venue for this matter is appropriate in the Middle District of North Carolina as agreed upon by the parties. In the MSA, the parties agreed that: "The state and federal courts located in the State of North Carolina shall have exclusive jurisdiction and venue over disputes initiated by either Party arising herefrom, and the Parties consent to the same." As such, this Court may properly exercise personal jurisdiction over Defendants, and jurisdiction and venue are otherwise appropriate in this Court.

14.     The MSA is governed by the laws of the State of North Carolina, including applicable statute of limitations.

## **FACTUAL ALLEGATIONS**

15.     The modern vending services industry has come a long way in the last twenty-five years. Back then, the only "vending services" available were vending machines that required the consumer to insert coins into the machine to obtain a product.

5

The "technology" then advanced to where the vending machines could accept dollar bills and issue (sometimes) proper change. During those times, owners of vending machines had no way to track inventory or sales trends, other than to physically travel to each machine to determine what inventory was out-of-stock. The owner would then travel back to their own facility to collect inventory and go back out to the vending machine to restock it. In addition, other than seeing which products were "sold out" in the vending machine, owners had no way to see (in real time) which products were "in-demand" until they returned to restock the vending machine.

16.     Over the last twenty-five years, the vending industry has evolved as technology has developed. Now, there are multiple types of "vending services," ranging from the upgraded vending machine (a/k/a a "smart vending machine" that now accepts multiple forms of cashless payments such as credit cards, a reloadable card and even a downloadable "app" on one's smartphone), to stand-alone, self-service "micro-markets" (which look like mini-convenience stores with products out on shelves that the consumer can grab, scan the bar code and then make a cashless payment). The vending machine typically has a "device" attached to it that reads the customer's credit card/reloadable card/app to complete the transaction. The micro-markets typically have something that looks like a stand-alone small computer-screen (known in the industry as a "kiosk") that has the ability both to conduct the cashless transaction and offer other touch-screen, consumer-focused benefits (i.e., reloading their card, increasing the available balance on their app, being made aware of certain product discounts, participating in certain loyalty

6

rewards programs, etc.).

17. The advances in technology have also benefitted the vending owners, by compiling data that enables them to manage their inventory better (i.e., see what products are out of stock in the vending machine and the micro-markets before traveling there to restock the products for sale), review data that evidences trends in consumer-buying-habits, and bring promotions to the consumer's vending experience where (just like in a regular convenience or grocery store) a customer might be offered a multi-purchase discounts or can gain rewards/benefits from frequently buying from a particular vending machine, micro-market or network. Promotions and programs designed to reward a consumer's loyalty toward particular vending machines/micro-markets/networks have exponentially increased sales and profits for the vending owners and are a pivotal feature for any vending owner's business today.

18. USConnect's business centers on its internet network system that links thousands of internet-enabled vending machines and micro-markets throughout the country that are owned by Affiliates and Operators. (the "USConnect Network"). The devices that are attached to the vending machines and the kiosks that are available at micro-markets contain a suite of technology features (the "USConnect Technology") that facilitate cashless transactions (i.e., credit/debit card processing, hosted balance cards, use of an app, etc.) and enhance consumer engagement (through product promotions and consumer loyalty programs).

19. Customers of both Affiliates and Operators can access the USConnect

Network through a unique USConnect card (the "Card") or an online and downloadable app that interacts with those kiosks that have the USConnect Technology. Through this interaction, the consumer can make cashless purchases and engage with the benefits of the USConnect Network. It is these kiosks that are the subject of this Complaint.

A.    **The Parties Reach an Agreement**

20.    Around 2017, USConnect started vetting manufacturers to help develop kiosks that used the USConnect Technology. Through its vetting process, USConnect identified VE as a possible partner.

21.    In November 2018, USConnect and VE entered into the MSA pursuant to which USConnect retained VE to aid in the development, manufacture, and sale of kiosks that contained the USConnect Technology (a/k/a the Integrated Products) to Affiliates and Operators.

22.    Under the MSA, VE was to offer the Integrated Products for sale directly to Affiliates and Operators. Per the MSA, the Affiliate/Operator would submit a purchase order to VE for each Integrated Product it wanted to purchase. The MSA then required VE to invoice USConnect for any and all Integrated Products ordered by any Affiliate/Operator.

23.    To make the Integrate Product operational with the USConnect Network, the Affiliate/Operator needed telemetry services. Pursuant to the MSA, VE was required to also provide support to the Affiliates and Operators to ensure they were receiving the telemetry services and connection to the USConnect Network once an Integrated Product

became operational. In exchange for these telemetry services and access to the USConnect Network, the Affiliate/Operator paid a monthly service fee (i.e., the Service Fee). Affiliates paid a lower monthly Service Fee than Operators. Per the MSA, the Service Fee was divided between USConnect (i.e., the USC Share) and VE (the "VE Share") in different percentages based upon whether the Integrated Product was owned by an Affiliate or an Operator.

24.    To ensure each Affiliate/Operator was properly charged for these telemetry services, the MSA provided that VE was obligated to send an invoice each month to USConnect for each and every Integrated Product that used the USConnect Network.

25.    These VE invoices were supposed to identify the total number of Integrated Products that had accessed the USConnect Network the preceding month, broken out by Affiliate/Operator. On each invoice, VE would charge USConnect for the VE Share of the Service Fee related to each Integrated Product that used the telemetry services and accessed the USConnect Network. Using the VE invoices, USConnect would then bill each Affiliate/Operator the entire Service Fee for each Integrated Product that VE identified. Upon collecting payment of the Service Fee, USConnect then retained the USC Share and remitted the VE Share for each Integrate Product to VE.

26.    Because VE had direct access to the Affiliates and Operators in accordance with the MSA, USConnect had little visibility into the extent of VE's conduct with respect to any particular Affiliate or Operator. The reality of the MSA meant that VE personnel were often communicating directly with Affiliates and Operators about the Integrated

9

Products and without the presence of USConnect personnel.

27.     The foregoing invoicing and payment arrangement was therefore included in the MSA to ensure that VE (which was providing the support to and interacting with the Affiliates/Operators) had the responsibility to properly invoice USConnect each month for any Integrated Product that used the USConnect Network, which in turn was then used to ensure that both USConnect and VE received their respective shares of the Service Fee as specified in the MSA.

28.     Per the MSA, VE was prohibited from directly billing any Affiliate or Operator for the Service Fee.

29.     The MSA also prohibited VE from receiving and retaining payment of the entire Service Fee from any Affiliate or Operator.

**B.      Defendants Purposefully Blur the Lines Between Themselves**

30.     Beginning in 2023, Defendants underwent a "rebranding" effort whereby they sought to convince the public that the two companies were the same, even though legally they were not.  At that time, VE Solutions was using the trade name, "Vendors Exchange, Inc.," which VE had first used years earlier.  Then, in 2023, "Vendors Exchange, Inc." announced that it was changing its name to "VE Solutions" and launched a media campaign that blurred the lines even further between the two companies.

31.     Upon information and belief, as part of its rebranding effort, VE attempted to assign the rights and benefits of its various contracts to VE Solutions, even if the contracts (like the MSA) precluded such assignments without the other party's consent.

10

The end result was that the party who appeared to be acting and obtaining the benefits of various contracts (like the MSA) was not, in fact, a party to the contract. As a result, if a party went to sue VE Solutions over a certain contract believing VE Solutions was, in fact, VE (which Defendants publicly claimed), it would be suing the wrong party. In addition, if VE Solutions used certain confidential information that only VE had the contractual right to use (such as with the MSA), VE Solutions would claim it had the contractual right to use the information when, in fact, it did not.

32.     The MSA did not permit VE to assign its rights or interest to any party without the consent of USConnect.

33.     USConnect never consented to VE assigning its rights in the MSA to VE Solutions.

34.     Nonetheless, VE Solutions has reaped and continues to wrongfully receive benefits from the MSA (and the Continuation Agreement) even though it has never been a party to either agreement.

### C.     Vendors Exchange Declines to Renew the MSA

35.     As the end of the initial term of the MSA was approaching, VE initially indicated to USConnect that it wanted to renew the MSA, only to then suddenly notify USConnect that it was, in fact, not going to renew the MSA.

36.     On October 30, 2024, VE entered into the Continuation Agreement with USConnect. Matt Shene signed the Continuation Agreement on behalf of VE as its "CEO." VE Solutions was not a party to the Continuation Agreement.

11

37. The Continuation Agreement addressed the business operations that were to continue after termination of the MSA. Under the Continuation Agreement, the parties agreed (among other things) that the Service Fee payment arrangement (including the manner of billing and the percentage each party was to receive of the Service Fee) would continue through the end of 2026 for all Integrated Products.

38. The Continuation Agreement did not provide a license for either Defendant to use the USConnect Technology to make and sell additional Integrated Products after the expiration of the MSA. Rather, the Continuation Agreement only permitted VE to serve Integrated Products that had previously been in service at some point during the MSA, as identified in an exhibit (prepared by VE) that was attached to the Continuation Agreement.

### D. The Parties' Performance under the MSA

39. Throughout most of the MSA's duration, it appeared to USConnect that VE was abiding by the terms of the MSA. Every month, USConnect received invoices from VE that identified the supposed number of Integrated Products a particular Affiliate/Operator had that used the telemetry services and the USConnect Network the month before, along with the VE Share of the Service Fee.

40. USConnect, in turn, billed the corresponding USConnect Affiliates/Operators the entire Service Fee for each of the identified Integrated Products, collected payment from the USConnect Affiliates/Operators, retained the USC Share, and remitted the VE Share to VE.

12

41.     Thus, it appeared to USConnect that it was receiving all of the USC Share for all of the Service Fees to which it was entitled under the MSA.

**E.     USConnect Learns of Defendants' Bad Acts**

42.     By 2023, VE, with assistance from VE Solutions, began developing its own kiosk to compete directly with the Integrated Products.  Through this development, Defendants misappropriated the USConnect Technology and otherwise misused USConnect's intellectual property.  Defendants' unlawful attempts to compete with USConnect and the Integrated Products are the subject of a lawsuit currently pending before the United States District Court for the Middle District of North Carolina, *USConnect, LLC v. Vendors Exchange International, Inc.*, Case No. 1:25-CV-00692-UA-JLW (the "Original Lawsuit").

43.     In response to the Original Lawsuit, Defendants claimed that they were one and the same entity during the MSA and thereafter.

44.     Unbeknownst to USConnect at the time it filed the Original Lawsuit, Defendants' misconduct went beyond the unlawful methods of competition that were the subject of the Original Lawsuit.

45.     In late 2025, after the Original Lawsuit was initiated, USConnect learned that Defendants had failed to properly invoice USConnect for all the Integrated Products that had used the USConnect Network in two distinct ways.

46.     First, Defendants failed to correctly list the total number of Integrated Products which used the USConnect Network on their monthly invoices sent to USConnect.

47.     Upon information and belief, Defendants' actions relating to some of these Integrated Products appeared to be the result of incompetence.  Nonetheless, because Defendants had failed to list all of the Integrated Products on their invoice, USConnect did not invoice all of the Affiliates/Operators for all of the Integrated Products that used the telemetry services and the USConnect Network.  As a result of Defendants' actions or inactions, USConnect did not receive all of the USC Share of the Service Fees it was otherwise entitled to receive.  In these instances, it appears (upon information and belief) Defendants did not collect any of the Service Fee either.

48.     Second, USConnect just recently learned that Defendants had actually been selling potentially hundreds (or more) Integrated Products to various USConnect Affiliates and Operators and purposefully failing to notify USConnect of these sales (i.e., the Undisclosed Kiosks).

49.      To maintain the secrecy of their actions (and so to keep all of the Service Fee for themselves, including the USC Share), Defendants never included the Undisclosed Kiosks on the monthly invoices to USConnect.

50.     Defendants then invoiced the Affiliates/Operators directly for the entire Service Fee associated with each Undisclosed Kiosk.

14

51.     Defendants then kept all of the Service Fee, including the USC Share, arising from each Undisclosed Kiosk.

52.     In doing so, Defendants breached the MSA and the Continuation Agreement and deprived USConnect of the USC Share of the Service Fee that rightfully belonged to USConnect.

53.      Upon information and belief, Service Fees on the Undisclosed Kiosks have been accruing for several years and legal action related to the Undisclosed Kiosks is likely approaching the applicable statute of limitations.

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT
**(Against VE)**

54.     USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

55.     The MSA was a binding agreement between USConnect and VE.

56.     The Continuation Agreement is a binding agreement between USConnect and VE.

57.     As more fully set forth above, VE breached the MSA and the Continuation Agreement in numerous ways, including but not limited to:

    a.      Improperly attempting to assign all of its rights and obligations under the agreements to VE Solutions;

    b.      Failing to properly invoice USConnect for all of the Integrated Products that used the USConnect Network;

c. Failing to notify USConnect of the Undisclosed Kiosks that it sold to Affiliates/Operators;

d. Failing to invoice USConnect for the Undisclosed Kiosks that used the USConnect Network;

e. Directly billing Affiliates/Operators the entirety of the Service Fee related to the Undisclosed Kiosks;

f. Failing to remit the USC Share of the Service Fee for each Undisclosed Kiosk.

58. As a direct and proximate result of VE's breach of the MSA and the Continuation Agreement, USConnect has suffered damages in an amount in excess of $75,000 to be proved at trial.

### SECOND CAUSE OF ACTION:
### <u>BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u>
#### (Against VE)

59. USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

60. The MSA and the Continuation Agreement were binding agreements between USConnect and VE.

61. Under each agreement, VE agreed that it would invoice USConnect for each Integrated Product that it sold to any Affiliate or Operator. In addition, VE agreed that it would invoice only USConnect for its portion of the Service Fees each month. Finally, VE

agreed that it would share the Service Fee with USConnect each month in the proportions set forth in the MSA and Continuation Agreements.

62. VE was therefore obligated to act in good faith, to deal fairly with and to adhere to the terms and spirit of the MSA and the Continuation Agreement. Such obligations included, but were not limited to the obligation of VE to refrain from:

      a.     Secretly selling the Undisclosed Kiosks to Affiliates/Operators and not reporting the same to USConnect;

      b.     Directly billing the Affiliate/Operator for any and/or all of the Service Fees related to the Undisclosed Kiosks;

      c.     Collecting and retaining the entirety of the Service Fee related to the Undisclosed Kiosks and thereby denying USConnect its rightful ownership of the USC Share.

63. VE breached the implied covenant of good faith and fair dealing within the MSA and the Continuation Agreement when it: a) sold the Undisclosed Kiosks to the Affiliate/Operator and failed to report the transaction to USConnect; b) failed to include the Undisclosed Kiosks on the monthly invoices it sent to USConnect; c) directly billed the Affiliate/Operator for the entirety of the Service Fee; and d) retained the USC Share of the Service Fee from the Undisclosed Kiosks.

64. Such actions, and the actions more fully set forth above in this Complaint, constitute a breach of the implied covenant of good faith and fair dealing inherent in the terms of the MSA and the Continuation Agreement.

17

65.     As a direct and proximate result of VE's breach of the implied covenant of good faith and fair dealing, USConnect has suffered damages in an amount to be proved at trial, including, but not limited to, the amount attributable to the USC Share of the Service Fee for each Undisclosed Kiosk for the duration that such Undisclosed Kiosk was/is in service.

### THIRD CAUSE OF ACTION:
### <u>CONTRACTUAL INDEMNIFICATION</u>
### (Against VE)

66.     USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

67.     Pursuant to Section 5.5(a) of the MSA as amended, VE agreed that it would indemnify, hold harmless and defend USConnect from any and all claims, damages, costs, charges and expenses, including reasonable attorneys' fees and costs, arising from any willful misconduct in connection with VE's performance of its obligations under the MSA.

68.     VE's actions as more fully set forth herein with regard to the Undisclosed Kiosks constitute "willful misconduct" under the MSA such that USConnect is entitled to recover all damages, costs and expenses (including attorneys' fees) that it has suffered as a result of the VE's actions herein.

69.     USConnect has been damaged in an amount in excess of $75,000 to be proven at trial arising from the aforementioned acts.

## FOURTH CAUSE OF ACTION: UNJUST ENRICHMENT
### (Against VE)

70.     USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

71.     USConnect pleads this cause of action against VE to the extent it is determined that neither the MSA nor the Continuation Agreement constitute an enforceable agreement that addresses the Undisclosed Kiosks.

72.     Through the actions described above, USConnect conferred benefits upon VE whereby USConnect provided access to the USConnect Network to the Affiliates/Operators using the Undisclosed Kiosks for which it did not receive any compensation with VE retaining all of the benefit in the form of the entirety of the Service Fee.

73.     VE consciously accepted those benefits, which were not provided gratuitously.

74.     It would be inequitable for VE to retain such benefits without adequately compensating USConnect for same.

75.     As a result of such acts, USConnect has been damaged in amount to be determined at trial.

## FIFTH CAUSE OF ACTION: CONVERSION
### (Against Defendants)

76.     USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

19

77.     Defendants directly invoiced Affiliates/Operators who owned/utilized the Undisclosed Kiosks the entire Service Fee each month.

78.     On their invoices, Defendants listed the total number of Undisclosed Kiosks that the particular Affiliate/Operator owned, the entire Service Fee for each Undisclosed Kiosk and the total amount of money the particular Affiliate/Operator owed in Service Fees for its Undisclosed Kiosks that month.

79.     Each Affiliate/Operator then sent payment to the bank account identified by Defendants in the invoice and, upon information and belief, in so doing the Affiliate/Operator referenced the particular invoice upon which it was paying such that the funds for each invoice were traceable.

80.     As such, the payments each Defendant received related to the Service Fees for each Undisclosed Kiosk are specific and identifiable funds and, based upon the terms of the MSA and Continuation Agreement, the USC Share of each Service Fee payment is also specific, identifiable and traceable funds.

81.     For each payment Defendants received for each Service Fee related to each Undisclosed Kiosk, the portion of said payment that was the USC Share rightfully belonged and still belongs to USConnect as it was the rightful owner.

82.     By retaining the USC Share of each Service Fee, they received related to each Undisclosed Kiosk, Defendants have exercised unauthorized dominion over each and every USC Share that rightfully belongs to USConnect.

83.     Upon information and belief, each Defendant has commingled the USC

20

Share of each Service Fee received related to each Undisclosed Kiosk into its bank account such that the Court should impose a constructive trust on said funds and/or, to the extent said funds have been used by Defendants to obtain personal property using the USC Share of the Service Fees that can be readily traced, impose an equitable lien on any such personal property.

84. Moreover, because Defendants had direct access to the Affiliates/Operators, USConnect has no ability to determine just how many total Undisclosed Kiosks exist from its own records and (by extension) how many instances Defendants directly billed an Affiliate/Operator for the entire Service Fee related to the Undisclosed Kiosk; and because Defendants have commingled the USC Share of each Service Fee related to each Undisclosed Kiosk, Defendants' books and records contain far superior knowledge of the entirety of Defendants' acts such that USConnect is entitled to an accounting so as to determine the extent of its damages.

85. Defendants' actions with regard to converting USConnect's USC Share were willful and wanton acts done with malice by Defendants toward USConnect. As such, USConnect is entitled to recover punitive damages for Defendants' conduct.

## SIXTH CAUSE OF ACTION: BREACH OF CONTRACT
### (Against VE Solutions)

86. USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

87.     USConnect pleads this claim to the extent the Court determines that VE and VE Solutions were the same entity and/or that VE Solutions was a party to the MSA and/or the Continuation Agreement.

88.     The MSA was a binding agreement between USConnect and VE Solutions.

89.     The Continuation Agreement is a binding agreement between USConnect and VE Solutions.

90.     As more fully set forth above, VE Solutions breached the MSA and the Continuation Agreement in numerous ways, including but not limited to:

   a.     Failing to properly invoice USConnect for all of the Integrated Products which used the USConnect Network;

   b.     Failing to notify USConnect of the Undisclosed Kiosks that it sold to Affiliates/Operators;

   c.     Failing to invoice USConnect for the Undisclosed Kiosks that used the USConnect Network;

   d.     Directly billing Affiliates/Operators the entirety of the Service Fee related to the Undisclosed Kiosks; and

   e.     Failing to remit the USC Share of the Service Fee for each Undisclosed Kiosk.

91.     As a direct and proximate result of VE Solutions' breach of the MSA and the Continuation Agreement, USConnect has suffered damages in an amount in excess of $75,000 to be proved at trial.

## SEVENTH CAUSE OF ACTION:
## <u>BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u>
### (Against VE Solutions)

92.     USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

93.     USConnect pleads this claim to the extent the Court determines that VE and VE Solutions were the same entity and/or that VE Solutions was a party to the MSA and/or the Continuation Agreement.

94.     The MSA and the Continuation Agreement were binding agreements between USConnect and VE Solutions.

95.     Under each agreement, VE Solutions agreed that it would bill USConnect for each Integrated Product that it sold to any Affiliate or Operator.  In addition, VE Solutions agreed that it would bill only USConnect for its portion of the Service Fees each month.  Finally, VE Solutions agreed that it would share the Service Fee each month in the proportions set forth in the MSA and Continuation Agreements.

96.     VE Solutions was therefore obligated to act in good faith, to deal fairly with and to adhere to the terms and spirit of the MSA and the Continuation Agreement.  Such obligations included, but were not limited to the obligation of VE Solutions to refrain from:

      a.     Secretly selling the Undisclosed Kiosks to Affiliates/Operators and not reporting the same to USConnect;

      b.     Directly billing the Affiliate/Operator for any and/or all of the Service Fees related to the Undisclosed Kiosks;

23

c.      Collecting and retaining the entirety of the Service Fee related to the Undisclosed Kiosks and thereby denying USConnect its rightful ownership of the USC Share.

97.      VE Solutions breached the implied covenant of good faith and fair dealing within the MSA and the Continuation Agreement when it: a) sold the Undisclosed Kiosks to the Affiliate/Operator and failed to report the transaction to USConnect; b) failed to include the Undisclosed Kiosks on the monthly invoices it sent to USConnect; c) directly billed the Affiliate/Operator for the entirety of the Service Fee; and d) retained the USC Share of the Service Fee.

98.      These actions, and the actions more fully set forth above in this Complaint, constitute a breach of the implied covenant of good faith and fair dealing inherent in the terms of the MSA and the Continuation Agreement.

99.      As a direct and proximate result of VE Solutions' breach of the implied covenant of good faith and fair dealing, USConnect has suffered damages in an amount to be proved at trial, including, but not limited to, the amount attributable to the USC Share of the Service Fee for each Undisclosed Kiosk for the duration that such Undisclosed Kiosk was/is in service.

### EIGHTH CAUSE OF ACTION:
### CONTRACTUAL INDEMNIFICATION
### (Against VE Solutions)

100.      USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

101.    USConnect pleads this claim to the extent the Court determines that VE and VE Solutions were the same entity and/or that VE Solutions was a party to the MSA and/or the Continuation Agreement.

102.    Pursuant to Section 5.5(a) of the MSA as amended, VE Solutions agreed that it would indemnify, hold harmless and defend USConnect from any and all claims, damages, costs, charges and expenses, including reasonable attorneys' fees and costs, arising from any willful misconduct in connection with VE Solutions' performance of its obligations under the MSA.

103.    VE Solutions' actions as more fully set forth herein with regard to the Undisclosed Kiosks constitute "willful misconduct" under the MSA such that USConnect is entitled to recover all damages, costs and expenses (including attorneys' fees) that it has suffered as a result of the VE's actions herein.

104.    USConnect has been damaged in an amount in excess of $75,000 to be proven at trial arising from the aforementioned acts.

## NINTH CAUSE OF ACTION: UNJUST ENRICHMENT
### (Against VE Solutions)

105.    USConnect incorporates the foregoing allegations by reference as if fully set forth herein.

106.    USConnect pleads this cause of action against VE Solutions to the extent the Court determines that neither the MSA nor the Continuation Agreement constitute an enforceable agreement that addresses the Undisclosed Kiosks.

107.    Through the actions described above, USConnect conferred benefits upon

VE Solutions whereby USConnect provided access to the USConnect Network to the Affiliates/Operators using the Undisclosed Kiosks for which it did not receive any compensation but VE Solutions retained all of the benefit in the form of the entirety of the Service Fee.

108. VE Solutions consciously accepted those benefits, which were not provided gratuitously.

109. It would be inequitable for VE Solutions to retain such benefits without adequately compensating USConnect for same.

110. As a result of such acts, USConnect has been damaged in amount to be determined at trial.

WHEREFORE, USConnect asks the Court:

1. For an award of actual damages in an amount to be proven at trial;

2. For an award of punitive damages related to Defendants' acts of conversion;

3. For the imposition of a constructive trust and/or equitable lien in a manner consistent with equity;

4. For an accounting related to all Service Fees Defendants received related to the Undisclosed Kiosks;

5. For an award of pre-judgment and post-judgment interest on all sums awarded hereunder;

6. For an award of attorneys' fees pursuant to the MSA's Indemnification obligation.

26

7.    For a trial by jury of all issues so triable; and

8.    For such other relief that the Court deems just and proper.

This the 17th day of February, 2026.

                              **WOMBLE BOND DICKINSON (US) LLP**

                              */s/Philip J. Mohr*
                              Philip J. Mohr (NC State Bar No. 24427)
                              John D. Wooten IV (NC State Bar No. 51074)
                              300 North Greene Street, Suite 1900
                              Greensboro, North Carolina 27401
                              Telephone: (336) 721-3577
                              Facsimile: (336) 733-8358
                              Email: Philip.Mohr@wbd-us.com
                              Email: JD.Wooten@wbd-us.com

                              John F. Morrow, Jr. (NC State Bar No. 23382)
                              Aaron J. Horner (NC State Bar No. 56335)
                              One West Fourth Street
                              Winston-Salem, North Carolina 27101
                              Telephone: (336) 721-3584
                              Facsimile: (336) 733-8429
                              Email: John.Morrow@wbd-us.com
                              Email: AJ.Horner@wbd-us.com

                              *Attorneys for Plaintiff*

WBD (US) 4923-6631-2071